**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.T., A MINOR | : | No. 37 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: K.T. | : | Superior Court entered June 2, 2022 |
| | : | at No. 1245 WDA 2021, affirming |
| | : | the Order of the Court of Common |
| | : | Pleas Allegheny County entered |
| | : | October 13, 2021 at No. CP-02-AP- |
| | : | 197-2019. |
| | : | |
| | : | ARGUED: November 29, 2022 |
| IN THE INTEREST OF: K.T., A MINOR | : | No. 38 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: ALLEGHENY COUNTY | : | Superior Court entered June 2, 2022 |
| CHILDREN, YOUTH AND FAMILIES | : | at No. 1279 WDA 2021, affirming |
| | : | the Order of the Court of Common |
| | : | Pleas of Allegheny County entered |
| | : | October 13, 2021 at No. CP-02-AP- |
| | : | 197-2019. |
| | : | |
| | : | ARGUED: November 29, 2022 |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: JUNE 21, 2023**

In this discretionary appeal, we are asked to determine whether the court that denied a county agency's petition for involuntary termination of a mother's parental rights gave "primary consideration to the developmental, physical and emotional needs and welfare of the child" as required by 23 Pa.C.S. §2511(b). More specifically, we explore whether the court evaluating the parent-child bond must determine whether the bond is

necessary and beneficial to the child, and severing the bond would cause the child to experience extreme emotional consequences, rather than a mere "adverse" impact. Upon review, we find error and thus (1) vacate the orders below, and (2) remand to the trial court for further proceedings consistent with this opinion.

## I.     Background

The Child K.T. was born on June 17, 2016.  Allegheny County Office of Children, Youth and Families (CYF) first became involved with her when she tested positive for cocaine at birth; CYF had been involved with Mother since 2009 regarding an older child. During CYF's investigation, Mother admitted use of marijuana and alcohol and CYF deemed her housing unstable.  CYF referred Mother for a drug and alcohol abuse assessment with Pennsylvania Organization for Women in Early Recovery (POWER), as well as housing assistance and in-home services with Family Resource.  CYF also required Mother to begin regular urine drug screenings.

Prompted by continued housing instability, a report of intimate partner violence between Mother and Child's biological father,[1] and Mother's failure to follow through with service referrals, CYF sought a finding of dependency on January 26, 2017.  Prior to the dependency hearing, CYF removed Child under an Emergency Custody Authorization (ECA) on March 7, 2017, due to a report Mother "allegedly became physical" with one of her older children who dropped Child.[2]  N.T. Termination Hearing, 3/22/21 at 15.  On March 27, 2017, the dependency court found Child dependent and ordered all contact between Mother and Child to be supervised.  Child was placed with a foster parent and

---

[1] Father's parental rights were involuntarily terminated in October 2021.

[2] Mother has two older children, daughter A. and son L.W.

adoptive resource, her godmother, in June 2017. The court also ordered Mother to complete a drug and alcohol assessment, related treatment, and urine drug screenings.

For more than two years, while Child remained in her foster home, and prior to CYF filing for termination, Mother was inconsistent with participation in CYF's recommended services.[3] During this time, she continued to struggle with her sobriety, mental health, and behavior, relapsing after treatment programs, testing positive on five occasions for substances, and gaining a criminal record of five summary citations, some involving her children, as well as aggressive behavior.[4]

---

[3] Mother attended some teaming and conferencing meetings with CYF. *See* N.T. 3/22/21 at 30. She attended most permanency review hearings. *See id.* at 31. Mother attended thirty-four of the fifty-seven mandated substance screenings. *See id.* at 84. In August 2017, Mother completed POWER's drug and alcohol assessment, after failing to comply on two other occasions, and she was "recommended for inpatient treatment." *See id.* at 62-63. Mother then checked herself into Gateway on September 27, 2017 for treatment and later transferred to Sojourner House. *See id.* at 63. She left Sojourner House without completing the program. *See id.* at 65. In December 2017, Mother completed an intake at Family Links after CYF referred her for mental health concerns. *See id.* at 85. Mother later began SHORES, a drug and alcohol treatment program, following a referral from CYF and a positive drug test, but SHORES discharged Mother for missing sessions. *See id.* at 65-66. On June 21, 2018, Mother completed another assessment with SHORES in which they recommended intensive outpatient services. *See id.* at 67. Instead, Mother agreed to twice a week, in-home counseling. *See id.* Mother successfully completed the SHORES program in January 2019. *See id.* at 72. In April 2019, Mother completed another drug and alcohol assessment and was given no further recommendations. *See id.* at 73-74. But, after another positive drug test result, CYF referred Mother for a POWER assessment in May of 2019. *See id.* Mother did not complete the assessment. *See id.*

[4] While Mother was pregnant with Child, she pled guilty to two summary citations of disorderly conduct. *See Int. of K.T.*, No. DP-091-2017, slip op. at 7 (C.P. Allegheny, Nov. 22, 2021). After Child's removal from her care, Mother pled guilty in 2018 to four summary citations: retail theft, harassment subject to other physical conduct, defiant trespassing, and disorderly conduct. *See id.* In August of 2019, Mother pled guilty to another summary citation of disorderly conduct and was also involved in an incident leading to a summary citation of disorderly conduct, engaging in fighting, in November of 2019. *See id.* at 7-8. Following CYF's filing for termination in October 2019, Mother pled guilty in 2020 to

Prior to CYF's filing for termination, Mother attended most visits with Child which were typically scheduled for three times a week. Visits were both supervised and unsupervised. In October 2018, the court permitted Mother to have unsupervised, overnight visits with Child, but by February 2019, Mother's visits were moved back to supervised due to concerns about her sobriety. In April 2019, the court gave permission to move back to unsupervised visits, but before these could begin, Mother tested positive for substances and the court granted CYF's request visits remain supervised. Mother also failed to return Child timely on two occasions, and once required CYF to seek a court order returning Child to its custody. *See* Order to Take Child into Custody, 6/19/19. Although Mother stabilized her housing by May 2019, CYF had ongoing concerns with Mother's continued substance abuse, recent criminal offenses, and failure to return Child in a timely fashion, and by August 2019, Child's permanency goal was changed to adoption. *See* N.T. 3/22/21 at 29-30.[5] By this time, Child was three years old and had not lived with Mother since June 2017.[6]

**A. Termination Proceedings**

In October 2019, CYF filed a petition to involuntarily terminate Mother's parental rights, and the court conducted a hearing over two days. CYF presented seven witnesses:

---

summary citations for harassment and criminal mischief. *See id.* at 8. Testimony at the termination proceeding showed three incidents, those leading to Mother's August and November 2019 citations and 2020 citations, involved her older children. *See infra* Section I.A.

[5] According to appellants, Mother did not file an appeal from this decision. *See* Reply Brief at 3 n.5. Mother does not dispute this account.

[6] Even during the period Child lived with Mother, Child was actually in maternal grandmother's care (with whom Mother lived) and Mother's contact was ordered to be supervised.

Amanda McCloy, a CYF caseworker; William Pipkins, family transportation supervisor with Second Chance, the organization that scheduled, supervised, and provided transportation for a portion of Mother's visits with Child; Myelodie Turner, Mother's caseworker with Second Chance; Brett Basic, police detective dispatched for the incident resulting in Mother's August 2019 disorderly conduct offense; Ronald Bobick, police officer dispatched to assist in the enforcement of an ECA for Mother's older child L.W.; Ryan Miller, police sergeant dispatched for the incident resulting in Mother's October 2020 guilty pleas on criminal mischief and harassment citations; and Neil Rosenblum, Ph.D., court-appointed clinical psychologist who performed three individual and interactional evaluations of Mother, Child, and Foster Mother. Mother presented three witnesses: Daniel Garrighan, facility director of Jade Wellness Center where Mother received drug and alcohol outpatient services starting in August 2020; Jawana Warren, site director at the Clairton Family Center where Mother completed parenting classes in October 2020; and Lisa Penn, program manager with POWER.

Dr. Rosenblum testified regarding his three evaluations, conducted in May 2018, January 2020, and November and December 2020. *See* N.T. Termination Hearing, 5/13/21 at 73. His testimony covered his assessment of Mother's mental health and substance abuse, Child's relationship and interactions with Mother and Foster Mother, and his ultimate opinion that adoption best serves Child's needs and welfare.

Dr. Rosenblum diagnosed Mother with mixed personality disorder with borderline and antisocial features. *See id.* at 82. He testified Mother "has consistently shown signs of a mood disorder," "does present with . . . a pattern of difficulty focusing[,] . . . tends to be emotionally reactive to stress . . . [and] has difficulty controlling her anger at times."

*Id.* at 75, 83. He explained Mother was forthcoming about substance abuse, but struggles "to understand the role of drugs in her life." *Id.* at 79. Dr. Rosenblum testified Mother made some progress but ultimately issued a guarded prognosis for her improvement because personality disorders are difficult to treat and require "years of counseling, combined with maturity and, in [Mother]'s case, probably psychotropic medication[.]" *Id.* at 82-83.

Regarding the bond between Mother and Child, he testified that Child is "always glad to see [Mother]," "loves her[,]" and enjoys spending time with her, but Child's relationship with her is "more ancillary" and "playful" like a "big sister" or "aunt." *Id.* at 84, 90, 93. He said Mother is "nurturing" and "affectionate[,]" but "tends to be comfortable with creating an emotional dependency." *Id.* at 85, 87. She is not "as focused on helping [Child] to expand her developmental competencies and to build her self-esteem." *Id.* at 87. Specifically, he noted, in the last two evaluations, Mother "spent more time focus[ed]" on "[Child]'s appearance," suggesting "she's not getting adequate physical care" with Foster Mother, than "engaging [Child] in positive activities." *Id* at 85-86. He further testified "I think it makes [Child] uncomfortable." *Id.* at 86. He went on to explain "[i]t is pretty well-known that [Mother] and [F]oster [M]other do not get along" and "[F]oster [M]other indicates that [Mother] has harassed her[.]" *Id.* at 85.

Dr. Rosenblum further testified that Child "receives excellent, outstanding care from her [F]oster [M]other" and "[h]er primary attachment is definitely to her [F]oster [M]other." *Id.* at 88, 90. He testified "[F]oster [M]other does a particularly good job of building [Child's] confidence and encouraging her[.]" *Id.* at 87. He explained "[Child] has developed attachments, healthy attachments, to her [F]oster [M]other[ and] her foster

siblings[.]" *Id.* at 89.  He explained her foster home "is the foundation of her emotional well-being." *Id.* at 121.

The court also questioned Dr. Rosenblum.  When the court asked whether "[M]other could mature to a point where she would be in a position to assume a safe and secure family environment," Dr. Rosenblum replied:

> Not for this child, no.  Again, I believe the die has been cast.  Attachment is most critically formed in the — between one to two years of life.  This child has lived now almost five years in the same home.  I think she has a secure foundation, a secure relationship with her primary caregiver.  I would say the verdict would be out as to whether birth mother might ever be in a position to parent a child successfully.  But for this child I believe there would be significant trauma . . . for her to be removed from this home.  So I don't see a very favorable prognosis even if mother was functioning significantly better than she is now, which, again, there's no guarantee.  But I think for this child the train has left the station quite some time ago.

*Id.* at 126-27.  Finally, in response to the court's question if "[C]hild should be allowed to maintain some degree of contact with [M]other[,]" Dr. Rosenblum further testified:

> Yeah.  I always — almost always feel that way.  I don't believe that [Mother]'s malicious towards [Child].  I think her love is genuine. . . . [I]f we were to look at ideally what would be in [Child]'s best interest, certainly the love that [Mother] has for her if it can be shaped into a supportive role, not a critical role, not putting [F]oster [M]other down, not criticizing her care, there's always an advantage to having those connections to, you know, biological roots and people who love you.

*Id.* at 127-28.

Dr. Rosenblum, after three evaluations within a two-and-a-half-year period, ultimately opined adoption would best meet Child's needs and welfare, explaining he did not believe "[Mother] is in a position to assume . . . a safe, secure family environment for [Child] that would allow her to grow and develop in a healthy manner without risk of some form of psychological harm or concern to her well-being." *Id.* at 93.  As to CYF's question whether "th[e] lack of contact [with Mother would] be so detrimental to [Child] that this

Court should not terminate parental rights," Dr. Rosenblum stated, "it would be a loss" that "does not outweigh the need for the opportunity to move forward in [Child's] life with the continuity of care and . . . emotional support that she receives in her current family environment." *Id.* at 130.

CYF caseworker McCloy provided detailed testimony on CYF's involvement with Mother, as summarized above. Regarding Mother's supervised visits, she testified:

> For the most part they seemed to go well. There were times where there was concerns about her lack of being interactive with [Child]. She was generally nurturing of [Child]. There were concerns at times that she would . . . want to leave and come back to the visits to either go to the store or pick up food or things like that.

N.T. 3/22/21 at 128. On cross examination, responding to whether "there [were] any concerns raised during the unsupervised visits[,]" McCloy explained:

> Not as far as the interaction between [Child] and [Mother]. The main concerns as far as them being switched between unsupervised and supervised has been related to [Mother]'s sobriety as well as on one occasion there was an incident in which she did not return [Child] . . . in a timely manner[.] . . . But as far as the interaction, there were no major concerns reported.

*Id.* at 130-31.

McCloy also testified, "while [Child] does not often communicate to [me] regarding Mother directly, when being transported to visits, [Child] does look forward to seeing [Mother]." *K.T.*, No. DP-091-2017, slip op. at 16, *citing* N.T. 3/22/21 at 129.

Second Chance's transportation supervisor Pipkins testified Mother attended 167 of the 195 visits scheduled with Child since July 24, 2017, and that to his knowledge, no Second Chance staff raised a concern in their written summaries regarding Mother's visits. *See* N.T. 3/22/21 at 181-83.

Caseworker Turner testified about Mother's allegations that Foster Mother left Child alone once and did not provide Child with adequate care.[7] *See* N.T. 5/13/21 at 10, 12, 20-21, 31-33. Turner explained these allegations were investigated and there were no concerns with Foster Mother's care. *See id.* at 10, 12. Turner also stated Mother told her "she and her sisters were looking for [Foster Mother] and if they seen her that there would be a problem" and that Mother regularly "watches [Foster Mother's] house because she doesn't feel like her child is safe." *Id.* at 8-9. Turner testified her own observations of Child in her foster home indicate: "[Child] is very comfortable. Whenever I visit she seems very happy. She smiles, she laughs. . . . [S]he refers to the caregiver as mom . . . [and] the caregiver's children as her brother and sister." *Id.* at 13-14.

The three police officers who testified provided factual context for Mother's criminal record. Detective Basic testified that, on August 1, 2019, "[Mother] got into a physical altercation with a friend of hers named Linda Smiley . . . and both Ms. Smiley and [Mother] were intoxicated at the time[.]" *Id.* at 43. He stated, "I guess [Mother's son L.M.] was picked up by Ms. Smiley is what was reported to us and like kind of thrown on the ground." *Id.* at 46. Sergeant Miller testified on August 5, 2020, Mother went to the home of her older daughter A.'s father, "pushed in the air conditioner and slapped the woman inside the house," allegedly because father was not feeding A. *Id.* at 66. Sergeant Miller

---

[7] Mother's complaints to Turner included showing her a picture of Child's underclothes, alleging they were not clean, and stating Child came to a visit hungry. *See* N.T. 5/13/21 at 12. Mother also sent Turner a video in which Mother asks Child about Foster Mother leaving Child in the care of her minor foster brother and Child, after some hesitation, states she was left with him for "eight hours." *See id.* at 26-33.

investigated and observed there was food in the home and the home was clean and appropriate.[8]

Lastly, the court heard testimony from Mother's three witnesses regarding Mother's progress following the initiation of involuntary termination proceedings.[9] Their testimony established Mother successfully completed a parenting program, POWER's mentoring program to "build sober support . . . and to maintain recovery[,]" and Jade Wellness's intensive outpatient treatment for drug and alcohol abuse; she also remained "fairly compliant" with Jade Wellness's subsequent "Level 1 Drug and Alcohol" outpatient treatment. *Id.* at 139-40, 161.

On October 13, 2021, the trial court entered an order denying CYF's petition to terminate Mother's parental rights. Although the court found CYF proved grounds for termination, specifically 23 Pa.C.S. §2511(a)(2), (5) and (8), the court held CYF failed to meet its burden under 23 Pa.C.S. §2511(b).[10] *See, e.g.*, *In re Adoption of C.M.*, 255 A.3d

---

[8] Another witness, Officer Bobick, testified regarding the enforcement of an ECA CYF obtained for Mother's son, L.M.

[9] When evaluating a petition for involuntary termination of parental rights, the court may not consider the parent's efforts to remedy conditions described under subsection (a)(1), (6) or (8) which are first initiated after receiving notice of the filing of the petition. *See* 23 Pa.C.S. §2511(b). Mother received notice of the termination petition on November 1, 2019. *See* CYF's Aff. Svc., 11/6/19.

[10] Section 2511 provides, in relevant part:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

343, 358 (Pa. 2021) (agency seeking termination has burden of proof to establish by "clear and convincing" evidence the existence of the statutory grounds for involuntary termination of parental rights). The court concluded "terminating the parental rights of Mother does not serve the needs and welfare of the child." Order Den. in Part Involuntary Termination, 10/13/2021. In its Pa.R.A.P. 1925(a) opinion, the court explained its decision. First, the court reviewed Mother's history with CYF, including both successful and failed attempts at complying with service referrals, personal struggles with substance abuse since the age of fourteen and mental health concerns, criminal record and treatment progress that occurred after the filing of termination. *See K.T.*, No. DP-091-2017, slip op. at 2-9, 14. The court also scrutinized Dr. Rosenblum's testimony, focusing on his opinion that Mother's love for Child "could be shaped into a supportive role wherein

---

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. . . . .

23 Pa.C.S. §2511.

Mother is able to support [Foster Mother]" and that "a connection to the child's biological mother would be beneficial to her." *Id.* at 7. The court cited Dr. Rosenblum's statement that, "while [Child] seems to regress in maturity around [Mother], some of this is due to the inherently limited interactions they have in addition to Mother's concerns about [Child's] care and appearance." *Id.* at 6-7. The court also recognized Dr. Rosenblum ultimately concluded a continued relationship with Mother "does not outweigh the need for the opportunity for [Child] to move on with her life." *Id.* at 7.

The court acknowledged Section 2511 requires a bifurcated analysis, where it must first find, by clear and convincing evidence, statutory grounds for involuntary termination under Section 2511(a) exist, before moving on to determine whether termination would meet the needs and welfare of the child under subsection §2511(b). *See id.* at 13. In addition to citing relevant Superior Court decisions, the court quoted this Court's guidance for its subsection (b) analysis:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.["] 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to . . . discerning [the] effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*Id.* at 12-13, *quoting In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (alterations in original).

The court then stated "CYF failed to demonstrate, clearly and convincingly, that termination would meet the needs and welfare of [Child]" under Section 2511(b). *Id.* at 15. Specifically, the court opined CYF did not meet its subsection (b) burden because

"[Child] ha[s] an emotional bond with [Mother], and [ ] permanently severing that bond would have a detrimental impact" or "adverse effect" on Child. *Id.* at 15, 18. Noting only two witnesses testified "to the emotional bond between Mother and [Child]," the court relied on CYF caseworker McCloy's testimony about Child's interactions with Mother and Dr. Rosenblum's opinion evidence to support its decision. *Id.* at 16-17. The court observed Dr. Rosenblum stated "[C]hild is eager to spend time with [Mother]" and "Child does have an attachment to Mother," "loves her" and "is always glad to see her." *Id.* at 17, *quoting* N.T. 5/13/21 at 84, 89. The court also quoted Dr. Rosenblum, clarifying "[w]hile the child has sometimes referred to her [F]oster [M]other as 'mother' or 'mom,' at other, later times, she has referred to Mother as 'mom' and [F]oster [M]other as 'god mom.'" *Id.*

Notably, the court considered "whether severing the bond between [Mother] and [Child] would adversely affect [Child]," referring to Dr. Rosenblum's recognition "that [Child] displayed reluctance at having to leave Mother at the end of the evaluation[:]" Child "began to cry[,] [and] . . . had to be carried out to [Foster Mother]." *Id.* The court relied on Dr. Rosenblum's testimony "that there has been no significant period of time where Mother and [Child] were not in some sort of contact" and "Mother sees [Child] more than many of the parents that he's evaluated who are in a similar situation." *Id.* at 18. The court quoted Dr. Rosenblum's opinion it would be "beneficial to [Child] to maintain contact with biological relatives" and "[she] should be allowed to maintain some degree of contact with [M]other." *Id.* Based on this evidence, the court ultimately concluded "terminating the parental rights of Mother does not serve the needs and welfare of the child." Order Den. in Part Involuntary Termination, 10/13/2021.

**B. Superior Court Opinion**

CYF and Child, through a guardian *ad litem*, appealed to the Superior Court, and the three-judge panel affirmed in a split decision.[11] The panel majority noted "Child present[ed] a substantially identical issue [as CYF,]" namely, whether the trial court erroneously denied termination "after CYF proved by clear and convincing evidence that termination of Mother's parental rights would best serve the developmental, physical and emotional needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(b)[.]" *Int. of K.T.*, 1245/1279 WDA 2021, 2022 WL 1793083, at \*2 (Pa. Super. June 2, 2022) (unpublished memorandum), *quoting* CYF's Superior Court Brief (original removed unnecessary capitalization).

According to the majority, CYF argued the trial court's conclusions "are manifestly unreasonable and unsupported by the record." *Id.* at \*5. Although CYF acknowledged the record supports the court's finding of an emotional bond between Mother and Child, it claimed the court erroneously "neglected to examine Child's bond with her [Foster Mother] or consider Child's need for permanency as part of its needs and welfare analysis." *Id.* Child argued the trial court took Dr. Rosenblum's reports and testimony out of context to support its holding termination of Mother's parental rights would not serve Child's needs and welfare. *See id.*

The panel majority considered the matter a "close call" and noted "in a fact-intensive case involving . . . termination of parental rights, the appellate court should review for an abuse of discretion and for whether evidence supports the trial court's

---

[11] Judges Colins and McCaffery comprised the majority, while Judge Murray filed a dissent.

conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court." *Id.* at *2, *quoting Int. of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021). The majority further acknowledged it must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record. . . . A decision may be reversed for an abuse of discretion only upon a determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *Id.*, *quoting T.S.M.*, 71 A.3d at 267 (citations and quotation marks omitted in original).

Turning to Section 2511(b), the panel majority explained the parental bond issue is "not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship." *Id.* at *3, *citing In re C.M.K.*, 203 A.3d 258, 264 (Pa. Super. 2019).[12] It acknowledged the "parent's emotional bond with her child is . . .

---

[12] The Superior Court first used the phrase "necessary and beneficial" in *In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super. 1990), where the court reversed a decision terminating parental rights. The trial court in that case had focused exclusively on the parents' inability to care for their children without assistance due to mental impairments. Interpreting "needs and welfare of the child" under subsection (a)(5), the *P.A.B.* court rejected this exclusive focus and directed courts to find what would best serve the children's needs and welfare. The stated goal for trial courts was to "examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is **necessary and beneficial**." *Id.* (emphasis added). We subsequently endorsed this reasoning when considering the parental bond in the context of a Section 2511(b) analysis. *See E.M.*, 620 A.2d at 484-85; *see also infra* Section II.A.ii. Since then, our lower tribunals have evaluated whether the parental bond is necessary and beneficial to the child in such cases. *See, e.g.*, *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018); *see also infra* note 23 and accompanying text.

only one of many factors to be considered by the court when determining what is in the best interest of the child."[13]  *Id.*, *quoting In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Following this framework, the majority reviewed the trial court's conclusions, recognizing Dr. Rosenblum testified about the parental bond, as well as Foster Mother's ability to meet Child's emotional and developmental needs, which the trial court did not address in its opinion.  *See id.* at *3-5.  The majority acknowledged the "abundant evidence that Child's bond with [Foster Mother] is a strong one, and the significant trauma that would be caused if Child was removed from the foster home."  *Id.* at *5.  The panel majority "allow[ed] that the record supports a finding that Child's needs and welfare may best be served by a life in foster mother's home[.]"  *Id.*

---

[13] Pennsylvania courts most often refer to the "best interests" of the child in the context of custody proceedings, where parents are adverse parties and have equal rights to the child.  *See Int. of Coast*, 561 A.2d 762, 767 (Pa. Super. 1989) (en banc), *appeal denied*, 575 A.2d 560 (Pa. 1990) ("A best interest of the child analysis, employed traditionally in custody proceedings between two parents, is a balancing of the relative virtues of the two homes in question."); *see also* 23 Pa.C.S. §5328(a) ("In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors[.]").  In Pennsylvania, this custody-specific balancing standard is not ordinarily applicable in the termination context when conducting a Section 2511(b) analysis.  *See, e.g.*, *In re Adoption of Steven S.*, 612 A.2d 465, 472 (Pa. Super. 1992), *appeal denied*, 625 A.2d 1194 (Pa. 1993) ("In a termination case, the trial court must not apply a best interests analysis in the sense of balancing the foster home and the natural parents' home.").  But, courts and litigants have also used the phrase in its colloquial sense to argue for or against termination — rather than to import the custody term of art.  *See, e.g.*, *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011), ("Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of **best interests** of the child."), *quoting In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (emphasis added).

The Adoption and Safe Families Act (ASFA) also employs this phrase.  *See, e.g.*, 42 U.S.C. §675(5)(E)(ii) (providing the following exception to the permanency timeline: "a compelling reason" that filing for termination "would not be in the best interests of the child"); *see also infra* note 20 (explaining ASFA's permanency timeline and its purpose).

Notwithstanding these observations, the majority affirmed, opining "[w]hile our Court has held that the orphans' court can equally emphasize the relationship between a child and a foster parent, we have not required the court to do so."  *Id.*, *citing N.A.M.*, 33 A.3d at 103 ("[T]he trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.").  In the majority's view, the record supported the trial court's "evaluation of the bond that clearly exists between Mother and Child, and its determination that this bond was worth preserving[,]" and the court was thus within its discretion to deny termination.  *Id.*

Judge Murray dissented, finding the trial court erred in its Section 2511(b) needs and welfare analysis.  She would have reversed because the trial court "focused exclusively on the bond between Mother and Child" and thus "ignored the legal mandate to consider 'the benefit of permanency.'"  *Id.* at *6, *citing T.S.M.*, 71 A.3d at 253 ("Courts must determine whether the trauma caused by breaking [that] bond is outweighed by the benefit of moving the child toward a permanent home.").  Judge Murray noted a "parent's emotional bond with his or her child is a major aspect" of a Section 2511(b) analysis, but the "mere existence of an emotional bond does not preclude the termination of parental rights.  Rather, the orphans' court must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship[.]" *Id.*, *quoting N.A.M.*, 33 A.3d at 103 (emphasis omitted, alteration in original).  Finally, Judge Murray observed a finding of a beneficial bond should not be based merely on the child's affection or feelings for the parent, but rather in terms of the child's development and mental and emotional health.  *See id.* at *7*, quoting In re K.K.R.-S.*, 958 A.2d 529,

535 (Pa. Super. 2008) ("If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent[.] Nor are we of the opinion that the biological connection between [the parent] and the child[ ] is sufficient in and of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [ ] mental and emotional health than the coincidence of biological or natural parenthood.") (emphasis omitted, alterations in original).

## II. The Present Appeal

CYF and Child filed a petition for allowance of appeal, and we granted review to consider the following issues as phrased by appellants:

1. Whether this Court should grant review to ensure that trial courts across the Commonwealth are uniformly applying the correct standard for evaluating the bond between a child and parent when conducting a needs and welfare analysis under Section 2511(b) of the Adoption Act in an involuntary termination of parental rights case by:

    a. Clarifying that the trial court must evaluate whether the bond is necessary and beneficial to the child and not just whether any parent-child bond exists; and

    b. Clarifying that the trial court must evaluate whether severing that bond would cause the child to experience extreme emotional consequences and not just any adverse effect?

2. Whether a divided three judge panel of the Superior Court, by ignoring this Court's decisions in *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251 (2013) and *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993), erred in affirming the trial court's denial of a petition for termination of parental rights when the almost 5-year-old child had been in care in a secure and stable kinship pre-adoptive foster home for almost four years, and it was undisputed that the mother was unlikely to ever be able to parent the child, that the mother was still court-ordered to have supervised visits due to concerns

about the mother's behavior, and that the court-appointed psychologist opined that the child needed permanence through adoption by her kinship foster parent with whom the child enjoyed a strong and secure bond?

*Int. of K.T.*, 283 A.3d 1249 (Pa. 2022) (*per curiam*). We proceed to consider the parties' arguments on each question.

## A. Standards for Section 2511(b) Analysis

### i. Arguments

CYF contends this Court has established factors specific to the parent-child bond assessment that a trial court must consider when conducting a needs and welfare analysis under Section 2511(b). CYF argues once a trial court determines the bond exists, it must then assess whether severing it by termination "would destroy something in existence that is necessary and beneficial" for the child and cause the child to "suffer extreme emotional consequences." CYF's Brief at 26, *quoting P.A.B.*, 570 A.2d at 525 *and E.M.*, 620 A.2d at 485; *citing, e.g.*, *T.S.M.*, 71 A.3d at 267. CYF proposes a step-by-step bond analysis incorporating this standard, emphasizing the mere existence of a bond or attachment of child to a parent does not preclude the termination of parental rights. *See id.*, *citing T.S.M.*, 71 A.3d at 267 ("[T]he mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition."). CYF states the test as follows:

> (1) determine if there is a bond,
> (2) determine what is the nature, status or health of that bond, *P.A.B.*, 570 A.2d at 526, by,
> > (2)(a) assessing if the existing parent-child bond is "something in existence that is necessary and beneficial" to the child. *Id.* ("family ties that no longer help but rather hinder the children"), and,
> (3) determine the effect on the child of severing the parent-child bond by,
> > (3)(a) assessing whether severance would cause not just some sense of loss or sadness but would cause the child to experience "extreme emotional consequences." *E.M.*, 620 A.2d at 485 ("It is clearly conceivable that a beneficial bonding could exist between a

parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences.").

CYF's Brief at 32 (citations cleaned up). A parent's own feelings of love and affection for her child, CYF contends, does not preclude termination. *See id.* at 26, *citing In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007).

CYF urges Section 2511(b) requires a "totality of the circumstances" or "totality of the evidence" review, and the "best interests" custody framework would support this analysis, while conceding the custody standard has not been required in termination proceedings. Nevertheless, CYF insists a child's best interests should be considered in the Section 2511(b) analysis, such that the focus is on the child rather than the parent's rights or interests. Moreover, CYF proposes, "[a]fter the State has established parental unfitness . . . the court may assume at the dispositional stage [section (b)] that the interests of the child and the natural parents do diverge . . . and thus has no obligation to consider the natural parents' rights in selecting dispositional alternatives." *Id.* at 28, *quoting Santosky v. Kramer*, 455 U.S. 745, 760 (1982) (emphasis omitted). Ultimately, consideration of what is in the child's best interests, CYF argues, ensures a more holistic Section 2511(b) assessment than conducted by the trial court here, and should include review of all the factors that impact the child's developmental, physical and emotional needs and welfare. CYF argues the trial court here simply held "so long as the child has 'some bond' with the parent and . . . may feel a sense of loss or some sadness," termination is blocked, "even if the child has been in foster care for four years and there is no likelihood that the parent will ever be able to safely parent the child." *Id.* at 33. CYF contends this lower standard, reliant on a child's emotion towards a parent, reduces the terms of Section 2511(b) to "an exercise in semantics[,]" because "[e]ven the most abused

of children will often harbor some positive emotion towards the abusive parent." *Id.* at 33-34, *quoting K.K.R.-S.*, 958 A.2d at 535.

CYF asserts the Superior Court correctly stated the trial court was required to discern whether the parent-child bond was "necessary and beneficial" to Child, but nevertheless failed to properly apply this standard to its review of the decision denying termination or recognize the trial court made no finding that the bond was necessary and beneficial to Child. For example, CYF contends the trial court did not assess the nature, quality or health of the parental bond considering Dr. Rosenblum's undisputed testimony Child's relationship with Mother is ancillary and not her primary attachment. CYF avers the trial court ignored Child's behavioral regression when visiting with Mother, Mother's "concerning tendency" to focus on Child's appearance, and Mother's reliance on creating emotional dependency rather than expanding Child's developmental competencies or self-esteem. *See id.* at 39-41.

CYF further avers the trial court ignored Section 2511(b) factors beyond the parental bond, noting the breadth of testimony that Child's bond with Foster Mother is primary to her well-being. *See id.* at 47, *citing, e.g.*, *K.M.*, 53 A.3d at 791-92 ("Whether a child's primary emotional attachment is with a foster parent rather than a birth parent is a significant factor in evaluating the child's developmental and emotional needs and welfare."). CYF argues the trial court ostensibly gave weight and credibility to certain evidence establishing the Section 2511(a) factors, but then abused its discretion by ignoring this same evidence in its Section 2511(b) analysis. *See id.* at 45-46, *citing Int. of L.W.*, 267 A.3d 517 (Pa. Super. 2021).

Child agrees this Court has established factors specific to the parent-child bond assessment, and that courts must determine the nature of the bond and the effect on the child of severing the bond. *See* Child's Brief at 23, *citing E.M.*, 620 A.2d at 485 *and T.S.M.*, 71 A.3d at 267. Like CYF, Child contends the existence of a bond alone does not preclude termination, *see id.*, *citing T.S.M.*, 71 A.3d at 270-71, but rather "the court must determine whether the bond exists to such an extent that severing the bond would 'destroy something in existence that is necessary and beneficial' for the child and cause the child to 'suffer extreme emotional consequences.'" *Id.*, *quoting E.M.*, 620 A.2d at 484-85; *see also id.* at 24 n.9 (collecting Superior Court cases employing the "extreme emotional consequences" standard).

Child also contrasts the "extreme emotional consequences" standard with the lesser one applied by the trial court: whether termination would have an "adverse effect" on Child. *See id.* at 24, *citing K.T.*, No. DP-091-2017, slip op. at 18. Child submits the court apparently "eliminate[d] the need for a full needs and welfare analysis" where a bond exists. *Id.* at 24 n.9; *see also id.* at 32. Child specifically argues an "adverse effect" is a "much lower" standard than requiring "extreme emotional consequences" to preclude termination. *Id.* at 24 n.9. Child thus claims the Superior Court erred by overlooking the trial court's application of an incorrect standard.

Child also submits the trial court ignored Section 2511(b) factors beyond the parental bond. Child insists that "[i]f a child's primary attachment is to her foster parent, this should be a significant factor in the court's evaluation of the child's developmental and emotional needs and welfare." *Id.* at 23, *citing K.M.*, 53 A.3d at 792. Child argues the trial court ignored Child's bond with Foster Mother and the fact she is her primary

attachment, even though the record contains substantial evidence that Child has a secure relationship with Foster Mother that provides emotional stability and well-being. *See id.* at 26. Furthermore, Child contends the court "failed to consider Child's need for permanency" by ignoring Dr. Rosenblum's opinion that "the only permanency outcome" is "adoption." *Id.* at 26-27, *citing* Dr. Rosenblum's Forensic Reports, 1/14/20 at 8 and 12/18/20 at 12-13.

The arguments of both appellants focus on the priority granted under both Pennsylvania and federal law to permanency for the Child. Relying on this Court's decision *In re Adoption of S.E.G.*, 901 A.2d 1017 (Pa. 2006), CYF observes the Adoption and Safe Families Act of 1997 (ASFA) "was enacted to address a child welfare system that focused almost exclusively on reunifying families[,]" and sought to move children towards the benefit of adoption more quickly. CYF's Brief at 32-33. Child explains ASFA, "implemented in this Commonwealth by 1998 amendments to the Juvenile Act, 42 Pa.C.S. §§6301-6375, mandates that participating states pass laws requiring child services agencies to file petitions for termination of parental rights when the child has been in care for fifteen of the last twenty-two months, unless certain exceptions apply." Child's Brief at 31 n.10. Appellants emphasize this Court's recognition in *T.S.M.* that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly." Child's Brief at 21; CYF's Brief at 50, *quoting T.S.M.*, 71 A.3d at 269. Appellants rely on the *T.S.M.* Court's statement that, "[f]ollowing ASFA, Pennsylvania adopted . . . the goal of finding permanency for children in less than two years, absent compelling reasons." Child's Brief at 22; CYF's Brief at 50, *quoting T.S.M.*,

71 A.3d at 269. They argue the trial court, in denying termination, failed Child as she has been in foster care basically her entire life.

Amici supporting appellants[14] agree the trial court's analysis based on an "adverse effect" of termination is a departure from a proper needs and welfare analysis. See Amici Brief at 14, 21. They assert the lesser standard applied below is unpredictable and will place a barrier to permanency for dependent children. See id. at 14, 23. Amici point out the physical, emotional, and behavioral symptoms children endure when cycling through families in the foster care system. See id. at 16-17, 19-21 (reviewing research on effects of adverse childhood experiences). Importantly, amici point out that without settling in a permanent home sooner rather than later, dependent children are at risk of aging out of the foster care system, without ever accessing the familial and community resources a permanent home provides. See id. at 22-23. According to amici, a permanent home provides children with a sense of security and belonging, and combats the negative impact of earlier adverse childhood experiences. See id. at 17-18, 20.

Mother responds that "extreme emotional consequences" is a brand new standard for assessing the effect of termination pursuant to Section 2511(b), never endorsed by this Court beyond dicta from E.M. and T.S.M. Mother argues the phrase was used by the E.M. Court to demonstrate the potential result if the court ignores the parent-child bond when considering a petition for termination. See Mother's Brief at 18, quoting E.M., 620 A.2d at 485 ("[i]t is clearly conceivable that a beneficial bonding could exist between a

---

[14] A group of thirty-five amici, including child welfare agencies, Montgomery Child Advocacy Project, the Defender Association of Philadelphia, Support Center for Child Advocates, Child Advocacy Unit of Montgomery County Public Defender's Office, children's and parents' counsel, and psychologists, filed a joint brief in support of appellants.

parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences."). And, according to Mother, the *T.S.M.* Court merely referred to "extreme emotional consequences" when describing a party's argument. *Id.* at 19, *quoting T.S.M.*, 71 A.3d at 266 ("There, the Court stated only that 'Mother observes that this Court has stated that the breaking of a child's bond to a parent can result in the child suffering "extreme emotional consequences."'"). Mother insists, in the alternative, if the Court finds *T.S.M.* supports this "new standard," the present case is factually distinguishable from *T.S.M.*, which involved an unhealthy, abusive parent-child bond unlike Mother and Child's, such that it should not apply here. *Id.* at 19-20.

Mother also claims appellants' proposed standard shifts the burden to parents opposing termination to prove termination would cause their child to suffer extreme emotional consequences, departing from longstanding precedent requiring the party seeking termination to establish termination is warranted. *Id.* at 21. With respect to appellants' argument the parent-child bond must be "necessary and beneficial," Mother mainly contends this language arises from a Superior Court decision, *P.A.B.*, 570 A.2d at 527, and the *E.M.* Court actually articulated a different standard drawn directly from the language of Section 2511(b): whether "severing the natural parent-child relationship would be contrary to the *needs and welfare* of the children." Mother's Brief at 20 n.6 (emphasis in original), *quoting E.M.*, 620 A.2d at 123. Mother acknowledges the Superior Court has relied on the "extreme emotional consequences" verbiage, but contends such lower court holdings are contrary to *E.M.*'s holding and the purpose of Section 2511(b). *Id.* at 19 n.5, *quoting e.g.*, *J.N.M.*, 177 A.3d at 944 ("When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will

destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences.") (quotation marks omitted). Mother asserts the court must consider "the significant gravity of a termination of parental rights, which has far-reaching and intentionally irreversible consequences for the parents and the child." *Id.* at 15, quoting *C.M.*, 255 A.3d at 358.

Mother thus claims the Superior Court did not err in affirming because the trial court properly considered all relevant factors under Section 2511(b) and the record supports the court's decision not to terminate. Mother points to the trial court's opinion where "over ten" out of nineteen total pages are dedicated to reviewing the evidence presented at the hearing. *Id.* at 30. Moreover, Mother contends there is no requirement that the trial court "explicitly weigh each and every potentially relevant factor and piece of evidence when examining the child's needs and welfare in a termination proceeding." *Id.*, *citing Commonwealth v. Moto*, 23 A.3d 989, 996 (Pa. 2011) ("[I]n the absence of evidence to the contrary, we presume that the trial court carefully considered the **entire** record, and we do not require the court to prove that it did so by citing to each fact and circumstance of the case.") (emphasis in original).

*Amici* supporting Mother[15] recognize the court must consider other factors in addition to "whether termination would destroy an existing, necessary and beneficial relationship." *Amici* Brief at 8, *quoting In re I.J.*, 972 A.2d 5, 12 (Pa. Super. 2009); *see also id.* at 6-7. However, they contend the court is not required to consider whether

---

[15] A group of twelve *amici*, including Juvenile Law Center, Community Legal Services of Philadelphia, Children's Rights, Give Us Back Our Children/Philadelphia, Movement for Family Power, NYU School of Law Family Defense Clinic, the Sayra and Neil Meyerhoff Center for Families, Children and the Courts, Women's Law Project, and law professors, filed a joint brief in support of Mother.

severance would cause extreme emotional consequences or give other Section 2511(b) factors the same weight as the parent-child bond, the severance of which, in their view, should receive "utmost attention." *See id.* at 7, 10, 18, *citing In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) ("The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond."). The agency seeking termination, *amici* contend, must prove "family ties either do not exist or no longer help but rather hinder the children." *Id.* at 20, *quoting P.A.B.,* 570 A.2d at 526. According to *amici*, this is because parents have a "prima facie right to custody" of their children, *id.* at 19, *quoting Ellerbe v. Hooks*, 416 A.2d 512, 514 (Pa. 1980), and family integrity is a constitutional right that cannot "be diluted because of a parent's income, disability, or lack of access to adequate medical care nor the fact that a potentially more resourced third party could offer a suitable alternative home." *Id.* at 5; *see also id.* at 20, *citing Troxel v. Granville*, 530 U.S. 57, 72-73 (2000); *Santosky*, 455 U.S. at 759 ("The factfinding does not purport—and is not intended—to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home.").

*Amici* emphasize the benefits in dependent children's development and long-term well-being if they maintain contact with biological parents. *See id.* at 12-16 (reviewing research, including interviews with youth formerly in foster care and a 2021 report by the federal Children's Bureau, that supports "relational permanency," *i.e.*, maintaining children's connections with families of origin)*. Amici* assert separation of biological families harms communities and "intensif[es] profound racial disparities in our child

welfare system rooted in the devaluing [of] Black parent and child bonds." *Id.* at 6; *see also id.* at 17, *quoting* Am. Bar Ass'n, Resolution 606, 11-12 (2022); *id.* at 21-29 (reviewing history of vagrancy, apprenticeship, and child welfare laws).

**ii. Discussion**

We begin by confirming our standard of review in this appeal from the Superior Court's decision affirming the trial court's decision not to terminate Mother's parental rights. We review the court's decision for abuse of discretion or error of law, and may reverse when that discretion has been abused or when the law has been misapplied. *See S.K.L.R.*, 256 A.3d at 1129. To the extent an issue raises purely a question of law or statutory interpretation, our standard of review is *de novo* and our scope of review is plenary. *See In re J.W.B.*, 232 A.3d 689, 695 (Pa. 2020), *citing Roverano v. John Crane, Inc.*, 226 A.3d 526, 534–36 (Pa. 2020). This first issue before us involves the interpretation and application of Section 2511(b) and we consider the parties' arguments through the latter, broad review standards. Specifically, appellants ask whether the trial court may deny termination under subsection (b) after considering only the child's bond with her parent and finding an "adverse effect" or "detrimental impact" of severing that bond.

First, we reiterate that the party seeking termination must prove "by clear and convincing evidence the existence of the statutory grounds for doing so," including that termination would best serve the child's needs and welfare pursuant Section 2511(b), in addition to termination grounds under subsection (a). *C.M.*, 255 A.3d at 358-59 (internal quotations omitted). There is no dispute here that subsection (a) grounds were established.

We next emphasize the pivotal language from Section 2511(b), which mandates that the court, having determined subsection (a) has been satisfied, "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." In interpreting a statute, we first consider the statute's plain language and may ascribe to its words and phrases the meaning they have acquired through their common and approved usage and in their context of the overall statutory scheme. *See* 1 Pa.C.S. §1921; *see also Commonwealth v. Gamby*, 283 A.3d 298, 306 (Pa. 2022); *Whitmoyer v. Workers' Comp. Appeal Bd.*, 186 A.3d 947, 954 (Pa. 2018). If we determine the statutory text is ambiguous, we may look to considerations beyond the text. *Whitmoyer*, 186 A.3d at 954. The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the "primary consideration" must be the child's "developmental, physical and emotional needs and welfare." This of course requires the court to focus on the child and consider all three categories of needs and welfare. Although subsection (b) itself does not specify a method for determining whether granting or denying termination best serves the child's needs and welfare, our case law has provided some elucidation of this requirement.

Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent. *See C.M.*, 255 A.3d at 358 ("A parent's right to make decisions concerning the care, custody, and control of his or her children is among the oldest of fundamental rights. [However, t]he time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support.") (citations omitted); *In re H.S.W.C.-B,* 836 A.2d 908, 911

(Pa. 2003) (In termination proceedings and appeals, "the best interest of the children is always paramount[.]").  *Cf. In re R.I.S.*, 36 A.3d 567, 579 (Pa. 2011) (plurality opinion) (Baer, J., concurring) ("It is incumbent upon the judicial system to be child-focused. Regardless of the heartbreak to a parent, children are entitled to every opportunity for a successful life, and a permanent, loving parental relationship greatly fosters that opportunity.").[16]

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis.  *See In re Adoption of L.A.K.*, 265 A.3d 580, 593 (Pa. 2021).  We have observed "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268–69.  Thus, the court must determine each child's specific needs. *See, e.g., In re Adoption of S.P.*, 47 A.3d 817, 831 (Pa. 2012) (affirming trial court's conclusion termination "best serve[d]" child's needs and welfare where father would likely not be able to provide for her, especially considering her special needs of developmental delays, child did not have a relationship with father, and child had strong bond with half-sister placed in same foster family).

---

[16] Contending the statute does not support our analysis of subsection (b), Dissenting Op. at 1, 11, our learned colleague in dissent reviews dictionary definitions of the terms "developmental," "physical," "emotional," "needs," and "welfare" to reach the same initial conclusions on the statute's plain meaning as we do.  *Id.* at 10 (reasoning subsection (b) is "child-focused" and "require[s] a comprehensive and holistic examination of the effect of terminating parental rights upon a child across multiple domains of that child's life").  At the same time, the dissent acknowledges that, beyond the statute's directive to focus on the child's needs and welfare, it does not prescribe how exactly to evaluate them all in reaching a termination decision.  *Id.* ("The General Assembly left open the question of *how* to evaluate a child's needs and welfare.") (emphasis in original).

Moreover, the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and brackets omitted). As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268; *see e.g.*, *In re D.C.D.*, 105 A.3d 662, 677 (Pa. 2014) (trial court properly considered child's "strong bond with her foster family with whom she has lived nearly all her life and who has indicated a desire to adopt her" pursuant to Section 2511(b)). And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which "is not always an easy task." *T.S.M.*, 71 A.3d at 267. We next review our two most consequential decisions regarding this latter requirement, which is at the heart of appellants' first issue.

In *E.M.*,[17] we first recognized that consideration of the child's bond with the parent should be part of the subsection (b) analysis. We considered the lower court's decision to terminate parental rights despite the psychologist-expert's testimony that "a better assessment of the [children's] relevant emotional factors could have been made" if she had observed them interacting with the foster father and biological mother, instead of only with their foster mother. 620 A.2d at 484. The Superior Court affirmed termination,

---

[17] When we decided *E.M.*, Section 2511(b) read "[t]he court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child." 620 A.2d at 483. Section 2511(b) was amended in 1995 to add the "developmental, physical and emotional" qualifiers found in the current statute. *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 n.2 (Pa. 1998). We recognize the importance of these qualifiers in guiding our interpretation of subsection (b), *see* Majority Op. at 28-30, and simply note the statutory amendment did not alter the "primary consideration" to be given the child's needs and welfare, and *E.M.* remains apt precedent for interpreting Section 2511(b).

holding "once a parent is adjudged incompetent under Section 2511(a)" and "adoption is imminent, . . . there is no need to ascertain whether a beneficial bonding exists as between the natural parent and the children, nor whether additional factors counsel that continuing the relationship might otherwise serve the needs and welfare of the child." *Id.* at 485 (emphasis omitted). We reversed, noting the record — which included scant evidence about the bond between the children and their biological mother — could not support termination, and reasoned "[w]here there has not been adequate consideration of the emotional needs of the children, a termination of parental rights cannot be sustained." *Id.* at 484. We also observed that "[w]hile . . . some bond between [mother] and the children would not *per se* block a termination of [parental] rights, it is at least a factor" to explore. *Id.* at 485. We rejected the Superior Court's reasoning to the contrary, holding that even with Section 2511(a) satisfied and the existence of an adoptive resource, "a **beneficial** bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer **extreme emotional consequences**." *Id.* (emphasis added). We further reasoned "[s]uch an **intense bond** may exist" that termination would not best serve the child's needs and welfare. *Id.* (emphasis added). We thus remanded "for a reevaluation of the needs and welfare of the children, taking into account whatever bond[] may currently exist between the children and [mother], as well as other factors having bearing upon whether termination is proper." *Id.*

In *T.S.M.*, we further explained the utility of the parental bond in the overall Section 2511(b) analysis by emphasizing the importance of permanency and stability, unanimously holding "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a

permanent home." 71 A.3d at 253. The children in *T.S.M* spent nearly a decade in foster homes without any adoptive resource. *Id.* Evidence also showed their mother's abuse and neglect caused them mental and behavioral impairments. *Id.* at 254-255, 261. The court nevertheless denied termination because the children had a bond with their mother and "CYF failed to prove that irreparable harm would not befall the children if the relationship with Mother were severed." *Id.* at 260. We found the court's denial "manifestly unreasonable, and thus an abuse of discretion" by relying only on this bond and ignoring the damage their unhealthy attachment with mother caused them, including its negative impact on their ability to "form attachments to foster families who could have provided [them] the necessary love, care and stability[.]" *Id.* at 270-71. We explained:

> The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond. . . . [A]ttention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

*Id.* at 267, 269 (quotation marks and citation omitted). We ultimately directed the trial court on remand to terminate mother's parental rights. *Id.* at 271.[18]

---

[18] In *T.S.M.*, the record established the mother's abuse and neglect likely caused the children's manifold psychological and behavioral conditions that complicated their ability to bond with a foster family. *See id.* at 270. The mother also "appear[ed] to [ ] interfer[e] [more overtly] with the children's bonding to their foster families . . . For example, [the son] reported that [the mother] told him that he would not be adopted and that his foster brothers were not his brothers." *Id.* (quotation marks omitted). Considering these facts and that the expert witness-psychologist recommended adoption for most of the children, we reasoned "[w]hether or not the children have current bonds to their foster families,

Our unanimous decision in *T.S.M.* also highlighted the importance of permanency and the need to find stability for dependent children in a timely fashion. As then-Justice Baer stated so eloquently, courts considering a termination petition "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development **quickly**." *Id.* at 269 (emphasis added). The *T.S.M.* Court acknowledged Pennsylvania's "dual focus [on] reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons," in accordance with federal law. *Id.*; *see* 42 U.S.C. §675(5)(E)(ii) (ASFA requires agencies in participating states to move for termination when children have been in foster care for fifteen of the most recent twenty-two months, in the absence of compelling reasons termination would not be in child's best interests); 42 Pa.C.S. §6351(f)(9) (courts must determine at each permanency hearing, *inter alia*, "whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child").[19]

---

there appears to be a strong likelihood of an eventual adoption." *Id.* (quotation marks omitted).

[19] Justice Baer further explained the statutory purpose behind this imperative timeframe:

> Prior to the mid–1990s, our national policy toward dependent children was to await reunification of parents and children. While undoubtedly a laudable goal, this single-minded focus on reunification led to 560,000 children in foster care as of September 1998, one-third of whom had been languishing in the foster care system for over three-years and drifting from placement to placement [(known as "foster care drift")], while their parents were unable to remedy the problems that led to the children's placement. In reaction to this dire situation, the United States Congress enacted ASFA, thereby altering the focus of dependency proceedings to include consideration of the need to move children toward adoption in a timely manner when reunification proved unworkable. One year after ASFA, in 1998, the Pennsylvania General Assembly amended our Juvenile Act in response to

*T.S.M.* further advised courts to move away from "concurrent planning" for reunification,[20] and towards an alternative permanent home, "when it becomes clear [] parents will be unable to provide [for] their children's basic needs in the near future[,]" *e.g.*, after a permanency goal change to adoption. *See id.* at 271-70. Otherwise, courts might "create confusion for the children and potentially increase the difficulty for them to bond with pre-adoptive parents, thus perpetuating the problem of foster care drift." *Id.* at 270.[21]

Accordingly, notwithstanding *T.S.M.*'s language directing "utmost attention" to the parental bond, a fuller review of relevant case law indicates that bond, plus permanency,

---

> the federal legislation. Our statutory scheme was modified to shift the statute's focus from a singular concern with reunification of the family to the dual purposes of preserving family unity when possible, and providing an alternative permanent family for a child when reunification of the biological parent and child could not be timely achieved.

*R.I.S.*, 36 A.3d at 576–77 (Baer, J., concurring) (citations omitted); *see also S.E.G.*, 901 A.2d at 1018-19 (discussing ASFA's response to foster care drift)

[20] "[C]oncurrent planning is a dual-track system under which child welfare agencies provide services to parents to enable their reunification with their [dependent] children, while also planning for alternative permanent placement should reunification fail." *S.E.G.*, 901 A.2d at 1019. ASFA mandated concurrent planning, like the 22-month permanency timeline, to prevent foster care drift. 42 U.S.C. §671(a)(15)(F) ("In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides that . . . reasonable efforts to place a child for adoption or with a legal guardian, including identifying appropriate in-State and out-of-State placements may be made concurrently with reasonable efforts of the type described in subparagraph (B) [relating to reunification]") (footnote omitted); *S.E.G.*, 901 A.2d at 1028, *citing id.* ("ASFA requires state plans to provide for concurrent planning as a measure to limit the time children spend in the foster care system[.]").

[21] The dissent ridicules our alleged "incessant focus upon 'permanency,'" as if it's a dirty word or "equate[s] [ ] to adoption," Dissenting Op. at 35, and "automatically supersedes all other needs and all other aspects of child welfare." *Id.* at 29. This far-fetched, reductive mischaracterization of our analysis is apparently designed to support the dissent's discussion of guardianship. *Id.* at 2, 30-37. But rather than view permanency as the automatic end game of the termination court's review, we understand permanency as an important pillar of the larger analysis of the dependent child's welfare — in both the federal and state context. Majority Op. at 34-35 n.19-20; *T.S.M*, 71 A.3d at 269.

stability and all "intangible" factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of "primary" importance in the Section 2511(b) analysis. Judge Bowes, writing for the panel in *N.A.M.*, observed that, although the parental bond is a "major aspect" of the Section 2511(b) analysis, "it is nonetheless only one of many factors to be considered by the court," in addition to the intangibles "such as love, comfort, security, and stability." 33 A.3d at 103. Moreover, the court must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. *See id.* (courts "must examine the status of the bond to determine whether its termination would destroy existing, necessary and beneficial relationship") (quotation marks omitted). *See also Int. of M.E.*, 283 A.3d 820, 836–37 (Pa. Super. 2022) (To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship[.]"); *J.N.M.*, 177 A.3d at 944 ("When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship[.]'"); *P.A.B.*, 570 A.2d at 525–26 (courts must consider the parental bond and determine "whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial"). It is only a necessary and beneficial bond, after all, that should be maintained when Section 2511(b) mandates the child's needs and welfare are of "primary" importance. As the statute directs, courts must evaluate whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare. This evaluation involves considering the effect of severing a child's bond with her parent. *T.S.M.*, 71 A.3d 267, 269. Severance of a "necessary and beneficial" bond would predictably cause more than

the "adverse" impact that, unfortunately, may occur whenever a bond is present.[22]  By

contrast, severance of a necessary and beneficial relationship is the kind of loss that

---

[22] The dissent objects to the phrase "necessary and beneficial" as too "abstract" and "amorphous" to provide guidance to courts assessing the parental bond, *see* Dissenting Op. at 2, 26-27, even though we derive its meaning from the plain text of subsection (b) and precedents.  The dissent argues this standard is inflexible in asking courts to consider both a child's needs and welfare, as subsection (b) instructs, in evaluating the bond.  *Id.* at 25.  Rather, the dissent prefers that trial courts shy away from severing any parental bond by advocating for prolonged dependency and more guardianship and downplaying the instability children face in the foster care system.  The dissent leaves unclear at what point, if ever, under its standard, a court may properly sever the parental bond.  *See id.* at 4-5; *see also id.* at 19 n.78 (emphasizing the children in *T.S.M.* "underwent thirty to forty psychological evaluations," which showed their parental bonds were "unhealthy with traumatic aspects," and "their dependency case dragged on for the better part of a decade.") (internal quotations and brackets omitted).

The dissent also baselessly claims we "focus[] upon **subtracting** relationships from children's lives," *id.* at 31, and "minimize[] a child's relationship to a parent in most situations."  *Id.* at 2 (emphasis in original).  The dissent imagines we "attach nearly insurmountable weight" or a "universal threshold" against the parental bond, *see id.* at 11, 24, and baldly asserts we favor termination in order to lighten the agency's burden.  *See id.* at 2, 24, 28-29, 37.  Relying on these mischaracterizations, the dissent further contends our use of the phrase "necessary and beneficial" runs contrary to subsection (b) and precedent.  *See id.* 10-11; *see also id.* at 21, *citing T.S.M.*, 71 A.3d at 262.  But in doing so, the dissent largely ignores the issue at hand.  As we have stated, evaluating whether a parent-child bond is necessary and beneficial does not pre-determine "most" such bonds as unworthy of preservation; indeed, we direct courts to continue their subsection (b) analysis even after finding child is bonded with parent.  They must determine whether maintaining the bond serves the child's needs and welfare and consider other subsection (b) factors.  The dissent agrees with this standard, *see* Dissenting Op. at 17 (recognizing "the importance of full evaluation of a child's needs and welfare" and the parental bond), but recasts it, seemingly to open the door to its inapt discussion about a permanency continuum and guardianship.  *See id.* at 31-37*.*  But, the "necessary and beneficial" requirement does not promote termination or lessen the agency's (or other petitioning party's) burden, and moreover, it is in line with our precedent.  *See supra* note 12*.*  In *E.M.*, we concluded the existence of some bond does not "*per se* block termination," but contemplated "a beneficial bond[]" or "intense bond" might.  620 A.2d at 485.  Likewise, in *T.S.M.*, the analysis did not stop at finding a "bond" but dug deeper into the children's other needs — permanency, "love, care, and stability" — before severing that "pathological" bond.  71 A.3d at 260.  Both decisions make clear termination should not be denied based solely on an emotional bond and adverse effect.

would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences"); *see also, e.g.*, *M.E.*, 283 A.3d at 837 ("To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'"); *J.N.M.*, 177 A.3d at 944 ("When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences[.]") (quotation marks and citation omitted).[23] Moreover,

---

The dissent seems to prefer its apparently interchangeable phrases "nature," "nature and health" or "nature and quality" in assessing the bond and insists the Court adopted such phrases in its *T.S.M.* decision. *See id.* at 4, 22, 37. But the *T.S.M.* Court did not employ this language in its discussion though indeed it considered the harm the pathological parental bond caused in that case. 71 A.3d at 267-271. Lower courts, at times, used the term "nature" along with "status" to describe the "necessary and beneficial" bond inquiry. *See. e.g., N.A.M.*, 33 A.3d at 103 ("One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. . . . court[s] must examine the status of the bond to determine whether its termination would destroy an existing, necessary and beneficial relationship") (internal quotation marks omitted). This makes sense: a court determining whether the parental bond is necessary and beneficial to the child is obviously assessing the bond's "nature" and "quality" and/or "health."

[23] The Superior Court's recent unpublished decisions often employ this standard. *See, e.g., Int. of S.L.D.*, 833/4 EDA 2021, 2021 WL 4774835, at *5 (Pa. Super., Oct. 13, 2021) (unpublished memorandum) ("The key questions when conducting this analysis are whether the bond is necessary and beneficial and whether severance of the bond will cause the child extreme emotional consequences."); *Int. of A.D.*, 1181 WDA 2020, 2021 WL 2073342, at *4 (Pa. Super., May 24, 2021) (unpublished memorandum) ("The Orphans' Court should instead focus on the existence of the child's bond with the parent, if any, and whether the child will 'suffer extreme emotional consequences' from severing that bond."); *Int. of E.B.*, 680 EDA 2018, 2018 WL 5629870, at *6 (Pa. Super., Oct. 31, 2018) (unpublished memorandum) ("[C]ourts must examine whether termination of parental rights would destroy an existing, necessary and beneficial relationship and

---

by evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain. *See T.S.M.*, 71 A.3d at 267, *quoting K.K.R.-S.*, 958 A.2d at 535 ("[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent") (alteration in original); *see also K.T.*, 2022 WL 1793083, at *7 (Murray, J., dissenting), *quoting K.K.R.-S.*, 958 A.2d at 535.[24]

---

whether severance of a bond would cause the child to suffer extreme emotional consequences.") (citations and quotation marks omitted); *In re T.D.M.*, 589 WDA 2013, 2013 WL 11260412, at *7 (Pa. Super., July 22, 2013) (unpublished memorandum) ("[T]his court finds that termination of the mother's parental rights would not cause the child to suffer any extreme emotional consequences[.]").

But other Superior Court panels — such as the majority below — have held termination is precluded where severance would have "detrimental" or "adverse" effects on the child. *See, e.g., In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010) (considering "whether any existing parent-child bond can be severed without detrimental effects on the child"); *In re S.C.*, 247 A.3d 1097, 1110 (Pa. Super. 2021) (same); *In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (same). And, in one case, the Superior Court considered whether severance of the parental bond would cause the child "undue dismay." *In re D.A.T.*, 91 A.3d 197, 208 (Pa. Super. 2014), *appeal denied*, 95 A.3d 278 (Pa. 2014) (affirming court's finding termination would best serve child's needs and welfare given child's primary attachment to foster parents who met his needs, mother's inability to meet child's overall psychological and physical needs for almost two years prior to termination hearing, and nature of child's bond with mother is such that severance would not cause the child undue dismay).

[24] The dissent untenably claims we "erase[] a child's 'feelings' and 'affection'" from subsection (b) by requiring courts to test for more than "an adverse or detrimental impact." *See* Dissenting Op. at 28. Obviously, and as we have stated, courts may weigh the child's feelings and affection towards a parent, **relative to all** her developmental, physical, and emotional needs and welfare. *See T.S.M.*, 71 A.3d at 269 ("[A]ttention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. . . . [W]e have an obligation to see to [children's] healthy development[.]"); *see also In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) ("If a

We are painfully aware of the heavy and irrevocable consequences of termination; we have described it as a "death penalty" in the dependency context. *C.M.*, 255 A.3d at 362. Although it is always a difficult and fraught process, we have nevertheless concluded that, under certain circumstances, termination of parental rights is intended "to prevent children from growing up in an indefinite state of limbo, without parents capable of caring for them, and at the same time unavailable for adoption by loving and willing foster families[.]" *In re H.S.W.C.-B*, 836 A.2d 908, 910–11 (Pa. 2003) (citations and quotation marks omitted). It is for this reason courts must not only consider the child's bond with the biological parent, but also "examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008) (emphasis added); *see also N.A.M.*, 33 A.3d at 103 (same); *A.S.*, 11 A.3d at 483 (same). It is why federal law sets a twenty-two-month permanency timeline and requires concurrent planning so that agencies can prepare to quickly place the child in an alternative, permanent home if reunification efforts fail. *See supra* notes 19-20; 42 U.S.C. §671(a)(15)(F) (concurrent planning provision); *id.* §675(5)(E)(ii) (permanency timeline); *see also id.* §675(5)(C) (ASFA requires participating states adopt "procedural safeguards" by holding a permanency hearing and determining a permanency plan at least every twelve months the child is in foster care).

---

child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent.").

In the present case, as we have stated, the trial court concluded termination would have a "detrimental" and "adverse" impact on Child, *K.T.,* No. DP-091-2017, at 17-18, and on appeal, the Superior Court panel majority affirmed because the record supported the lower tribunal's holding "permanently severing that bond would have a [detrimental] impact on [Child]." *K.T.*, 2022 WL 1793083, at *3, *quoting K.T.,* No. DP-091-2017, at 15.

Neither lower tribunal, however, explicitly considered whether severance in this case would destroy a necessary and beneficial parental bond, despite the panel majority's reiteration of relevant case law mandating such consideration while reviewing the entire record. Although the trial court relied in part on Dr. Rosenblum's testimony that "Child does have an attachment to Mother and that [Child] 'loves her, she enjoys seeing her and spending time with her,'" *K.T.,* No. DP-091-2017, at 17, *quoting* N.T. 5/13/21 at 87, the court did not expressly evaluate whether the bond was necessary and beneficial.[25]

It is also unclear whether the trial court considered Child's bond with Foster Mother, as required by *T.S.M.*, 71 A.3d at 268 — its opinion is silent on this point despite record evidence that Child calls Foster Mother "mom" and lived almost all of her life with her.[26] Nor did the court expressly consider any part of the record that established Child's foster home is the foundation of her emotional well-being, care, and development. Further, we cannot discern whether the trial court considered that Child is in a

---

[25] There was, of course, evidence the bond might be harmful to Child, that Mother: seemed "comfortable with creating an emotional dependency" with Child rather than helping her "expand her developmental competencies [ ] to build her self-esteem[;]" involved Child in her conflict with Foster Mother; and made Child "uncomfortable" with her "concerning tendency . . . to focus or fuss about [Child]'s appearance, . . . that she's not getting adequate physical care" with Foster Mother. *See* N.T. 5/13/21 at 85-87.

[26] Child is now nearly seven years old (born June 17, 2016) and has lived with Foster Mother since June 2017.

**preadoptive home**, *T.S.M.*, 71 A.3d at 268, beyond simple acknowledgment in its procedural history that Foster Mother is an "adoptive resource." *See K.T.,* No. DP-091-2017, at 3, 15-18. The court apparently did not evaluate whether Mother is potentially impeding Child's future permanent placement in this preadoptive home, as directed by *T.S.M.*, 71 A.3d at 269, despite undisputed evidence that Mother repeatedly criticized Foster Mother. Moreover, the court did not discuss the importance of permanency, let alone explicitly determine pursuant to *T.S.M.* whether the "detrimental impact" of severance was nevertheless outweighed by the benefit of moving Child toward a permanent home.

In fact, the lower tribunals focused their Section 2511(b) analysis only on whether severing the parental bond would have an "adverse" or "detrimental" impact on Child and, finding such impact was supported by the record, concluded this one factor precluded termination of Mother's parental rights, above all other elements that should comprise a complete subsection (b) needs and welfare analysis. But a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare*.*

The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. §6351(f)(9) and federal law ASFA, 42 U.S.C. §§675(5)(C), (E);

whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.[27] These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs. *See T.S.M.*, 71 A.3d at 268–69 ("[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved."). Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.[28]

---

[27] The dissent questions why we discuss intangibles in the foster home. Dissenting Op. at 23 n.92. Yet the dissent simultaneously recognizes this Court has interpreted emotional needs and welfare to include intangibles such as love, comfort, security, and stability and that courts should assess those intangibles in the foster home. *Id.* at 4 ("whether a child is in a pre-adoptive home with caregivers who provide necessary love, care, and stability").

[28] The dissent unmoors this concept from its context in our review of the subsection (b) standard and factors, using this myopic approach to argue we impose a "new" four-factor test for subsection (b) that removes trial court discretion to look at other considerations. Dissenting Op. at 1, 23. Indeed, to satisfy its rhetorical goals, the dissent goes so far as to fabricate a completely baseless interpretation of our holding and ignores our repeated recognition that the trial court has discretion to weigh all the evidence and make credibility determinations regarding agency witnesses. *Id.* at 24. The dissent also imagines that an "incongruent result" of our holding is "a trial court may weigh only a 'necessary and beneficial' parental bond" but "any degree and quality of bond existing between a child and foster caregivers." *Id.* (emphasis omitted). Yet, by its own inapposite logic, the dissent proposes trial courts must always weigh the health of the parental bond and its interference with the child's bonding to a foster parent, but requires no similar inquiry of the foster caregiver bond. *See id.* at 4. Nevertheless, the dissent prefers its own pre-defined list of three subsection (b) factors and eight sub-factors. *Id.* at 4-5.

First, we have not invented an exhaustive list of considerations nor removed discretion from the court, but instead above emphasize factors the trial court below did not adequately consider. We recognize termination decisions involve a case-by- case, child-

Finally, to meet its burden, the party seeking termination must prove by clear and convincing evidence that termination best serves the child's needs and welfare. *See C.M.*, 255 A.3d at 358–59.[29] To determine whether the petitioning party has met this

---

focused determination of child's specific developmental, physical, and emotional needs and welfare. Majority Op. at 28-30. Courts making these determinations **must consider and weigh** certain evidence **if it is present in the record**, but the court naturally may look to additional information that is relevant to the inquiry. Even the dissent agrees there are mandatory factors beyond the parent-child bond and the impact of severance; they are all included in its own test. Dissenting Op. at 4-5 ("the child's permanency and security needs, . . . whether a child is in a pre-adoptive home . . . with caregivers who provide necessary love, care, and stability; . . . whether a child has a bond with a foster caregiver; . . . the length of time children have spent in foster care") (footnotes omitted). But the dissent's test goes beyond the specific issue before us, and creates new, problematic issues.

For example, the dissent's suggested factor (3)(e) requires trial courts to always consider whether a child "feels competing loyalty to a parent and foster caregiver," *id.* at 4, even though this point is beyond the issue before us and we never previously required such consideration under subsection (b). *See T.S.M.*, 71 A.3d at 269-70. Moreover, despite the dissent's criticism of our analysis as improperly "pre-tilt[ed]" against the parental bond, Dissenting Op. at 2, notably it is the dissent's test that is "pre-tilted" against the foster parent, even in a case such as this one, where the foster parent is a pre-adoptive resource. Our purpose here is not a quest for an exhaustive list of factors beyond those addressed by the parties in the present appeal, but rather to decide the issue before us based on their arguments.

Nor does our analysis "discount[]" the pain of severance, as the dissent pretends. *See, e.g.*, Dissenting Op. at 2. The dissent envisions hypothetical situations where the "bond may not be beneficial, but it may nonetheless be necessary to the child insofar as the pain of severing it would be so traumatic that it trumps all other considerations." *Id.* at 24-25. First, we note the trial court here did not find the bond to be healthy or unhealthy. Moreover, as we have stated, *see* Majority Op. at 36-37, the court must consider the effect of severance, including any emotional pain to the child. The bond analysis we advance focuses on **all** the child's needs and overall welfare and allows the trial court discretion to elect the termination decision that is best for the child.

[29] The dissent contends we "alleviate agency burdens." Dissenting Op. at 37; *see also id.* at 2. However, in reiterating the imperative burden for termination here, we emphasize it remains unchanged and with the agency or other party petitioning for termination. *C.M.*, 255 A.3d at 358 (burden balances constitutional parental rights, the child's needs and welfare, and termination's irreversible effect).

burden, the court must conduct a full subsection (b) analysis focused on the child. The court must not truncate its analysis and preclude severance based solely on evidence of an "adverse" or "detrimental" impact to the child. Therefore, to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial.[30]

We therefore hold the Superior Court erred in the present case by affirming the order denying termination based on a legally erroneous application of Section 2511(b). We do not prescribe "magic words" for the trial court's recital, *see* Pa.R.A.P. 1925(a), and we recognize the case law on this issue has been opaque at times, but the court has to make clear all of the foregoing factors were considered and the correct standard applied in weighing them. The trial court here did not explain the subsection (b) considerations of foster parent bond, preadoptive home, and need for permanency – it made no reference to them at all in its discussion, despite the fact the record included relevant evidence. As we have explained, "an emotional bond" with a parent is legally insufficient to preclude termination of parental rights without determining whether such bond is necessary and beneficial to the child and weighing the other factors present in the record.

---

[30] Appellants argue that to preclude termination, a trial court must find, in addition to a necessary and beneficial bond, severance of the bond would cause the child to suffer extreme emotional consequences. But we conclude this proposed standard is too limiting. Instead, we view proof of "extreme emotional consequences" as one part of the court's broader analysis of a child's specific needs, where the nature of a parent-child bond might preclude termination. *See E.M.*, 620 A.2d at 485 ("[A] beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences."). In other words, evidence that severance would cause the child to suffer extreme emotional consequences is one way to demonstrate a necessary and beneficial bond, rather than the only way to preclude termination.

Likewise, an "adverse effect" or "detrimental impact" of severance alone cannot demonstrate a necessary and beneficial bond. In this case, we cannot discern whether the court considered the other factors present in this record but we can conclude it conducted a legally erroneous parental bond analysis.[31]

## B. Application of Section 2511(b) to the Present Record

### i. Arguments

Having settled the first issue regarding the legal standard to be applied in a Section 2511(b) analysis, and having determined the lower tribunals erred in that analysis, we now address the parties' arguments on the second record-based claim of error.[32] In their separate briefs, CYF and Child both argue the record does not support a denial of termination when applying either the correct Section 2511(b) standard or the trial court's less stringent "adverse effect" or "detrimental impact" test. CYF avers "[t]he totality of the

---

[31] The dissent favors Mother's position that trial courts should not have to "explicitly weigh each and every potentially relevant factor and piece of evidence when examining the child's needs and welfare in a termination proceeding." Mother's Brief at 30 (emphasis omitted). *See* Dissenting Op. at 40-41, *quoting Commonwealth v. Jackson*, 722 A.2d 1030 (Pa. 1999) (courts need not "address, *seriatim*, the applicability and importance of each factor and fact in reaching its final determination," as legislature chose to impose no requirement for an express discussion of every consideration). The dissent ignores that we do not require an "express discussion of every consideration" or an explicit weighing of every piece of evidence. We simply expect termination courts to make clear the foregoing subsection (b) factors were considered and the correct standard applied in weighing them. In any event, the dissent's various statements on this point are at odds with its simultaneous recognition a "more robust analysis" by the trial judge was wanting here, and "the Superior Court erred" particularly in failing to acknowledge the trial judge must evaluate "child's relationship with a prospective long-term caregiver." Dissenting Op. at 38 n.146, 42. Our remand decision is necessary under such circumstances as Child is entitled to a decision based on this requisite consideration of all her needs and welfare.

[32] The parties repeat to some extent their positions on the first issue. We focus here on arguments we did not consider in Section II.A. *supra*.

evidence does not . . . logically lead to the trial court's conclusions" and argues this case is not a "close call." CYF's Brief at 36, 39. CYF relies, for example, on evidence establishing Mother's inability to provide healthy support, guidance, and care to Child, or to model socially acceptable interpersonal behaviors, renders her relationship with Child less than necessary and bordering on harmful. *See id.* at 41.

Child argues Dr. Rosenblum's reports and testimony provide "overwhelming evidence that Child's bond with Mother was not necessary and beneficial," and "that severing that bond would not cause extreme emotional consequences." Child's Brief at 27 (quotation marks omitted). Child concedes the parental bond "could be of benefit to her," but contends the evidence does not establish severance would cause her to "suffer 'extreme emotional consequences[.]'" *Id.* at 31, *quoting E.M.*, 620 A.2d at 482. CYF and Child thus both challenge the evidentiary foundation for the trial court's conclusion Child would be "adversely affected" by severance, claiming the court abused its discretion in ignoring certain evidence and focusing improperly on other facts. *See* CYF's Brief at 42-44; Child's Brief 27-30.

Mother responds that appellants are improperly reweighing evidence when this Court has "explicitly instructed appellate courts to 'defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness [because appellate courts] … are not in a position to reweigh the evidence and the credibility determinations of the Trial Court.'" Mother's Brief at 31, *quoting In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010); *see also Amici* for Mother's Brief at 9-10, *quoting S.K.L.R.*, 256 A.3d at 1124 ("[T]he appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions . . . [and] not search the record

for contrary conclusions or substitute its judgment for that of the trial court"). Mother concedes appellants' arguments show the record might support a different result, but insists this does not establish an abuse of discretion. Mother's Brief at 29. Thus, Mother submits, the record supports the trial court's decision.

Mother further notes the trial court was not required to accept Dr. Rosenblum's ultimate conclusion that the harm of termination would not outweigh Child's need to move forward in her current family environment. *Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 772 A.2d 419, 424 (Pa. 2001) ("[T]he fact-finder is not constrained to accept the ultimate opinion of an expert merely because the witness is unrebutted and has provided some credible testimony."), *quoting Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 730 A.2d 1017, 1021 (Pa. Cmwlth. 1999) (*en banc*) (emphasis omitted). Mother emphasizes that denying termination does not mean Child's relationship with Foster Mother ends but rather that the status quo is maintained.[33]

---

[33] Mother makes an additional argument that appellants ignore Permanent Legal Custody (PLC) as a potential solution to keep Child's connection with Mother while she remains in her foster home. PLC "is an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian. Parental rights are not terminated." *In re S.H.*, 71 A.3d 973, 977 (Pa. Super. 2013) (citation omitted); *see also* 42 Pa. C.S. § 6351(a)(2.1) (prescribing PLC as a type of custody order a court may grant when finding a child dependent).

Appellants respond that PLC is not before this Court because such remedy falls within the jurisdiction of juvenile court, outside the jurisdiction of the court proceeding here, and further, Mother made no appeal from the order that changed her permanency goal to adoption in 2019. *See* Appellants' Joint Reply Brief at 3, *quoting R.I.S.*, 36 A.3d at 575 ("Questions regarding the propriety of an order granting or denying a goal change petition are, of course, discrete inquiries requiring an analysis of interests exquisitely separable from those interests reviewed in questions relating to the involuntary termination of parental rights."). We agree with appellants that PLC is outside the scope of the present appeal, although we acknowledge it is an option in appropriate cases, just as open

## ii. Discussion

Appellants essentially argue the Superior Court should have reversed the denial of termination on this record, and further, they would have us order termination of Mother's parental rights on this record. We decline to do so. *See, e.g.*, *S.K.L.R.,* 256 A.3d at 1123 (appellate courts "are not in a position to make the close calls based on fact-specific determinations"), *quoting R.J.T.*, 9 A.3d at 1190. Appellate courts reviewing such fact-bound claims arising in termination matters "should defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan[;] and . . . [e]ven if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id.* at 1124 (quotation marks omitted). We will not depart from this well-established standard here. Thus, considering termination's irreversible effect on a child's relationship with a parent, we allow the trial court an opportunity to

---

adoption may suit other circumstances. *See S.H.*, 71 A.3d at 978; *In re S.B.*, 943 A.2d 973, 983–84 (Pa. Super. 2008) (discussing the standard for PLC and situations for which it is best suited); 23 Pa.C.S. §2731 *et seq.* (providing adoptive parents the option to enter a court-enforced agreement with their child's birth parents to facilitate ongoing contact or communication.).

The dissent agrees "PLC is not before us." Dissenting Op. at 33. At the same time, the dissent insists we have placed PLC "off limits in cases involving the termination of parental rights[.]" *Id.* at 34. As we have surmised, this is apparently intended to tee up inapposite discussion of PLC and guardianship, and an irrelevant and unsupported suggestion open adoptions are "rare." *Id.* at 35-37. But we place no limits on a trial court's consideration of PLC in the appropriate context, which is not this case. PLC is a permanency goal when neither reunification nor adoption is best suited for the child, 42 Pa.C.S. §6351(f.1)(3). For example, a court may grant PLC when a caregiver accepts legal responsibility of a child but is unwilling or unable to adopt. *See id.*; *see also* 42 Pa. C.S. §6351(a)(2.1). In any event, before PLC is available, the record must reflect the court ruled out adoption as a permanency goal, and it does not here. 42 Pa.C.S. §6351(f.1)(3).

review the record or further develop it with the foregoing clarification of the 2511(b) analysis in hand.

## III. Conclusion

As we have today clarified the standard for courts applying 23 Pa.C.S. §2511(b) to a petition for involuntary termination of parental rights, including all factors that must be considered by the court in that analysis, we conclude the orders below must be vacated and the matter remanded to the trial court for further proceedings consistent with this opinion.

Chief Justice Todd and Justices Donohue, Mundy and Brobson join the opinion.

Justice Wecht files a dissenting opinion.